LESLIE G. KINDSCHI and SIGNE S. KINDSCHI, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Kindschi v. Commissioner
Docket Nos. 3106-77, 3107-77, 3108-77, 3109-77, 3110-77, 3111-77, 3112-77, 3113-77, 3114-77, 3115-77, 3116-77, 3117-77, 3118-77, 3119-77, 3120-77, 6856-77.
United States Tax Court
T.C. Memo 1979-489; 1979 Tax Ct. Memo LEXIS 33; 39 T.C.M. (CCH) 638; T.C.M. (RIA) 79489; December 6, 1979, Filed Thomas G. Ragatz,David F. Grams, and Stephen B. Braden, for the petitioners. Scott R. Cox, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Dkt. No.
(Petitioners)
Year
Deficiency
3106-77
Leslie G. & Signe
1972
$11,604.00
S. Kindschi
1973
4,144.00
3107-77
Gary W. & Lorraine
1972
417.00
I. Woroch
1973
195.00
3108-77
Marcia L. Terman
1972
4,617.38
1973
837.00
3109-77
Lealands Corporation
1972
2,511.73
3110-77
Duane A. & Phyllis
1972
3,731.82
Anderson
1973
1,505.08
3111-77
Raymond J. & Letty
1972
2,001.90
Morton
3112-77
Kenneth D. & Carol J.
1972
16,186.57
Opitz
3113-77
Robert A. & Elaine R.
1972
8,125.49
Sandahl
173
4,261.64
3114-77
Michael E. & Marlyn A.
1972
5,229.12
Donogan
1973
2,119.68
3115-77
John A. & Mary H.
1972
8,093.00
Frantz
1973
6,542.00
3116-77
Perry J. & Sheila J.
1972
7,252.36
Armstrong
1973
8,376.17
3117-77
Douglas J. & Winifred
1972
314.41
N. Baker
3118-77
Tad M. & Diane L.
1972
936.99
Baker
1973
678.96
3119-77
William E. Currier
1972
3,976.88
6856-77
William E. & Carol J.
1973
13,906.00
Currier
3120-77
Marcus & Sheila
1972
3,775.21
Cohen
1973
1,502.75
*35 Concessions having been made, the remaining issues for decision are: (1) When did Chapel Hill partnership acquire an economic interest in the Chapel Hill apartment complex so as to be entitled to a deduction for depreciation under section 167(a). [2]
(2) Whether the Chapel Hill partnership was the "original user" of the Chapel Hill apartment complex within the meaning of section 167(j) (2) so as to qualify for accelerated depreciation under section 167(b) in 1972 and 1973. (3) Whether the payment of $90,000 by the Chapel Hill partnership to Arthur G. Grandlich in December 1972 was deductible by the partnership in 1972 as interest under section 163(a). (4) Whether the payment of $34,797.50 by the Chapel Hill partnership to the City of Madison, Wis., in December 1972 was deductible by the partnership in 1972 as real estate taxes under section 164(a). (5) Whether the $9,000 received by petitioner Perry J. Armstrong in March 1973 was a commission payment and therefore ordinary income, or a payment for the release of an option and therefore entitled *36 to capital gain treatment under section 1234(a). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. At the time of filing their petitions herein, the residences of the petitioners were as follows: Dkt. No.
(Petitioners)
Residence
3106-77
Leslie G. & Signe
Monroe, Wis.
S. Kindschi
3107-77
Gary W. & Lorraine
Denver, Colo.
I. Woroch
3108-77
Marcia L. Terman
Chicago, Ill.
3109-77
Lealands Corporation
Madison, Wis.
3110-77
Duane A. & Phyllis
Madison, Wis.
Anderson
3111-77
Raymond J. & Letty
Madison, Wis.
Morton
3112-77
Kenneth D. & Carol
Madison, Wis.
J. Opitz
3113-77
Robert A. & Elaine
Hilton Head Island,
R. Sandahl
S.C.
3114-77 Michael E. & Marlyn
Madison, Wis.
A. Donogan
3115-77
John A. & Mary H.
Monroe, Wis.
Frantz
3116-77
Perry J. & Sheila
Madison, Wis.
J. Armstrong
3117-77
Douglas J. & Winifred
Oregon, Wis.
N. Baker
3118-77
Tad M. & Diane L.
Conyers, Ga.
Baker
3119-77
William E. Currier
Madison, Wis.
6856-77
William E. & Carol
J. Currier
3120-77
Marcus & Sheila
Madison, Wis.
Cohen
During the years in issue, petitioners were partners *37 in a Wisconsin limited partnership known as Chapel Hill. Where petitioners are husband and wife, only the husband was a partner and the wife was joined solely by reason of having filed a joint return. Petitioners Douglas J. Baker, Tad M. Baker, and Gary W. Woroch were members of an organization known as Baker Properties which held their interests in the Chapel Hill partnership. The partnership interest of petitioner Robert A. Sandahl was held by a trust bearing his name. In 1971, Arthur G. Grandlich (Grandlich) was the owner of real property located in Madison, Wis., on which he was constructing an apartment complex to be known as the Chapel Hill apartments.During the fall of 1971, Grandlich was attempting to sell the apartment complex. Grandlich had given an oral listing to National Mortgage Corporation (National Mortgage) and had agreed to pay National Mortgage a commission of $40,000 if an acceptable sale was arranged. In October of 1971, while National Mortgage was attempting to arrange a sale of the Chapel Hill apartments, petitioner Perry J. Armstrong (Armstrong) secured an oral option from Grandlich to purchase the apartments for $2,350,000. No payment was made by Armstrong *38 to Grandlich for this option. Armstrong did not personally have the funds to purchase the apartments, but intended to bring in other investors to obtain the necessary capital. Since Armstrong was the owner of an abstract title insurance company in Madison and not a real estate broker, to help him find other investors, Armstrong contacted petitioner Kenneth D. Optiz (Optiz), who was president of Optiz Realty, Inc., a real estate brokerage firm in Madison. Opitz subsequently agreed to help Armstrong find investors with the capital to purchase the apartments. In exchange for Optiz' help, Armstrong orally assigned a one-half interest in his option to Optiz. Once enough investors were committed, Armstrong and Optiz intended to establish a limited partnership to purchase the Chapel Hill apartments from Grandlich. To obtain the financing to build the Chapel Hill apartments, Grandlich had obtained three mortgage notes, each in the amount of $615,000. The notes were secured by a single underlying mortgage on which Grandlich was personally liable. Before Grandlich could sell the apartments, it was necessary of the mortgage notes and from the company carrying his loan insurance. *39 At the same time Armstrong and Optiz were working with Grandlich to arrange a sale of the apartments, National Mortgage was attempting to arrange a sale with Roger Gaumnitz, an employee of Optiz' real estate brokerage firm. When National Mortgage learned that Armstrong and Optiz had an option to buy the apartments from Grandlich, an officer of National Mortgage contacted them and explained that National Mortgage was in a position to prevent the mortgage note holders and the insurance company from giving their consent unless National Mortgage's right to the $40,000 sales commission from Grandlich was preserved. To avoid problems in obtaining the consent agreements from the mortgage note holders and the insurance company, Armstrong and Optiz agreed with National Mortgage that the $40,000 commission should be split; National Mortgage would keep $22,000 and Armstrong and Opitz would each receive $9,000. On December 29, 1971, National Mortgage sent a letter to Armstrong confirming their agreement. The letter stated in part: Enclosed is a copy of the letter agreement regarding the commissions for the sale of Chapel Hill between [Grandlich] and National Mortgage Corporation. This *40 is to confirm when National Mortgage Corporation receives the $40,000.00 at "Time T", National Mortgage Corporation will pay you $18,000.00 for the release of your options. In December 1971 Armstrong and Opitz orally assigned their option to themselves as co-trustees. On December 30, 1971, Armstrong and Opitz, as co-trustees, signed a written agreement with Grandlich whereby Grandlich agreed to sell the Chapel Hill apartments to Armstrong and Opitz. The agreement signed by the parties was labeled "Land Contract" and provided in part: WITNESSETH, FIRST, that the Purchasers hereby agree and bind their legal representatives, to pay or cause to be paid to the Vendor, his heirs, or assigns, the sum of Two Million Three Hundred Fifty Thousand ($2,350,000.00) dollars in the manner following: five thousand ($5,000.00) dollars at the ensealing and delivery hereof: the balance of $2,345,000.00 as follows: When the project achieves a gross monthly income of $24,000.00, and in addition, the improvements to be constructed thereon, * * * are completed (hereinafter called "Time T"), then:
Purchasers shall execute a note to the Vendor in the amount of $150,000.00 for a term of one year *41 (which may be extended for one additional year, at the option of the Vendor), at an interest rate of 8% per year. Purchasers shall pay $350,000.00 to the Vendor. * * *
Beginning at "Time T", Purchasers agree to make payments to the Vendor pursuant to the terms and conditions of three notes which are secured by a Mortgage recorded in Volume 257 of Records, page 337, #1293649, copies of said notes are attached hereto * * *. * * *
The said Purchasers further agree that they will pay, when due and payable, all taxes and assessments which have been assessed or levied on the above described premises since "Time T", and also all such as may be assessed or levied subsequent to "Time T" thereon or upon the interest of said Vendor in said premises; * * *. The Purchasers further agree that they shall insure and keep insured against loss or damage the buildings now on said premises and such as may hereafter be erected thereon during the life of this contract in the sum of at least two million ($2,000,000) dollars, against loss or damage by fire or other cause * * * and the Purchasers shall pay the premium on such policy or policies when due * * *. The Purchasers further *42 agree to hold the said premises from the date hereof, as the tenants by sufferance of the Vendor, subject to be removed as tenants holding over, by process under the statute in such case made an provided, whenever default shall be made in the payment of any of the installments of purchase money, interest, taxes, assessments or insurance premiums as above specified; and also to keep the buildings and improvements on said premises in as good repair and condition as they now are, except ordinary wear and decay, and not to do any act whatsoever which tends to depreciate the value of said premises.
Second, that the Vendor hereby agrees and binds his heirs, executors and administrators, that in case the aforesaid sum of two million three hundred fifty thousand ($2,350,000.00) dollars, with the interest and other moneys shall be fully paid and all the conditions herein provided shall be fully performed at the times and in the manner above specified, he will on demand, thereafter cause to be executed and delivered to the Purchasers, or their heirs or legal representatives, a good and sufficient Warranty Deed, in fee simple, of the premises above described, free and clear of all legal liens *43 and incumbrances, except the taxes and assessments herein agreed to be paid by the Purchasers, and except any liens or incumbrances created by the act or default of the purchasers, their heirs, legal representatives or assigns and purchasers hereby state that they are satisfied with the title as shown by the abstract submitted to them for examination. * * *
Fourth, the Vendor agrees to manage the project until "Time T" in consideration of an amount equal to the rents accrued thru "Time T". "Manage" as used above is to include the following: Advertising the project for rent and absorbing the cost thereof. Renting the apartments constructed thereon, in accordance with the Rent Schedule attached hereto * * *. Paying all other costs of maintainance and operation of the project thru "Time T", including, but not limited to all costs of utilities. Said management operations shall be subject to periodic review by the Purchasers.* * * In accordance with the terms of this contract, on December 30, 1971, Armstrong and Opitz together made the initial payment to Grandlich of $5,000 toward the purchase of the Chapel Hill apartments. Although petitioners Armstrong and Opitz *44 intended the December 30, 1971, contract to embody their agreement with Grandlich up to that point, since Grandlich had not yet obtained the consent agreements from the three mortgage note holders and the insurance company, and because they had not yet raised the necessary capital from investors, they did not intend this contract to be the final form of the sale; rather Armstrong and Opitz recognized that further negotiations might be necessary with respect to some of the contract terms. [3]
By March of 1972, Grandlich had obtained all of the necessary consent agreements and Armstrong and Opitz had received commitments from a sufficient number of investors to purchase the apartments. However, during the course of their negotiations with Grandlich, Armstrong and Optiz concluded that in order to make the proposed limited partnership more attractive to the investors, the following changes had to be made in the terms of the December 30, 1971, land contract: (1) the partnership's liability on the land contract should be nonrecourse in nature; (2) the purchasers should pay *45 the vendor interest on the unpaid purchase price for the period between the date of the final contract and "Time T"; (3) the purchasers should pay a pro rata share of the 1972 real estate taxes due on the apartment property. These changes as well as others were reflected in two land contracts executed on April 1, 1972. In the first contract, Grandlich, as vendor, transferred the Chapel Hill apartments to Heather Hills, Inc. (Heather Hills) as purchaser. Heather Hills was a corporation owned by Opitz and his wife. In the second contract, Heather Hills, as vendor, transferred the Chapel Hill apartments to Armstrong and Opitz, as purchasers. Although Armstrong and Opitz were listed as the purchasers in the second contract, they intended to assign their interest in this second contract to a limited partnership which would then become the purchaser of the apartments. Heather Hills was used only as an intermediary in the sale to enable Armstrong's and Optiz' limited partnership to purchase the apartments from Grandlich with only nonrecourse liability. Since Grandlich was personally liable on the underlying mortgage on the apartments, by having him transfer the apartments to Heather *46 Hills, Armstrong and Optiz could guarantee Grandlich's mortgage obligation, while at the same time allow the limited partnership to purchase the apartments from Heather Hills with only nonrecourse liability. Consequently, in the contract between Grandlich and Heather Hills, Grandlich, as vendor, not only had the right to foreclosure but he could also hold Heather Hills, as purchaser, liable for any balance due on the contract at the time of default. However, in the contract between Heather Hills and Armstrong and Opitz, Heather Hills' remedy, as vendor, against Armstrong and Opitz or their assignees, as purchasers, was limited to strict foreclosure. In all other respects the two land contracts executed on April 1, 1972, were identical. The pertinent provisions of the contract between Heather Hills, as vendor, and Armstrong and Opitz, as purchasers, were as follows: WITNESSETH: That the Vendor, in consideration of the payments to be made and the covenants and agreements by the Purchaser to be performed, as hereinafter set forth, hereby sells and agrees to convey unto the Purchaser, upon the prompt and full performance by the Purchaser of the covenants and agreements of this *47 contract to be by the Purchaser performed, the following described real estate in Dane County, State of Wisconsin: * * * * * *
Vendor shall complete the improvements on the premises, * * *. If the said improvements are not completed by September 1, 1972, Vendor shall be assessed a penalty of $500.00 per day until said improvements are so completed. The Purchaser, in consideration of the covenants and agreements herein made by the Vendor, agrees to purchase the above described premises, and to pay therefor to the Vendor * * * the sum of two million, two hundred twenty-five thousand and 00/100 Dollars, in manner following: $5,000.00 at the execution hereof, the receipt whereof is hereby acknowledged, and the balance as follows: On September 1, 1972, Purchaser shall pay: (1) $225,000.00 on principal; (2) Accrued interest on the unpaid balance hereunder ($2,220,000.00) at the rate of 9.72% per annum [from April 1, 1972 to September 1, 1972;] (3) $150,000.00 on principal, in the form of a note to the Vendor which shall have a term of one year and bear interest at the rate of 8% per annum [which may be extended, at the option of the Vendor, for one additional year provided *48 that the Purchaser shall pay the accrued interest one year from the date of said note.] From September 1, 1972 the balance unpaid hereunder shall bear interest at the rate of 8 3/4% per annum. On October 1, 1972, November 1, 1972 and December 1, 1972, Vendees shall pay interest to the Vendor at the rate of 8 3/4% per annum on the unpaid balance hereunder [($1,845,000.00)]. Begining January 1, 1973, Purchaser shall pay monthly to the Vendor the sum of $15,184.35, provided the entire purchase money and interest shall be fully paid on or before December 1, 1998. * * *
The purchaser hereby states that he is satisfied with the title as shown by the abstract submitted to him for examination; * * * The Purchaser shall be entitled to take possession of said premises on April 1, 1972. The Purchaser shall be entitled to remain in possession as long as he performs all covenants and agreements herein mentioned on his part to be performed and no longer. The Purchaser covenants and agrees as follows: 1. To pay before they become delinquent all taxes and assessments now or hereafter assessed or levied against and on the real estate described in this contract. * * * *49 2. To keep said premises insured for fire and extended coverage for at least the sum of $2,000,000.00, to pay the premiums there when due, * * *. 3. To keep the premises in good condition and repair. 4. To keep the premises free from liens superior to the lien of this contract, or the rights of the Vendor in the premises. 5. Not to commit waste nor suffer waste to be committed. 6. Not to do any act which shall impair the value thereof. * * *
The Vendor hereby agrees that in case the aforesaid purchase price with the interest and other moneys shall be fully paid and all the conditions herein provided shall be fully performed at the times and in the manner specified, he will on demand, thereafter cause to be executed and delivered to the Purchaser, a good and sufficient Warranty Deed, in fee simple, of the premises above described, free and clear of all legal liens and encumbrances, except any liens or encumbrances created by act or default of the Purchaser, and except easements and restrictions of record, zoning and other municipal ordinances. * * *
The two land contracts executed on April 1, 1972, differed from the December 30, 1971, land contract *50 in a number of respects. In addition to the provision for nonrecourse liability, the other changes made in the April contracts were as follows: (1) the purchase price was $2,225,000 rather than $2,350,000; (2) the purchasers were to begin payment on September 1, 1972, rather than at "Time T"; (3) the purchasers were liable for interest on the unpaid balance of $2,220,000 at the rate of 9.72% per year from April 1, 1972, until September 1, 1972; (4) the purchasers were liable for the 1972 real estate taxes on the apartment property after April 1, 1972, (5) the exception for "ordinary wear and decay" in the purchasers' maintenance obligation was removed; (6) the vendor was liable for liquidated damages in the amount of $500 per day if construction of the apartments was not completed by September 1, 1972; and (7) the provision for management of the apartments by Grandlich was removed. Shortly after the two contracts were executed on April 1, 1972, the parties made several amendments to the terms of both contracts. The amendments to the Heather Hills-Armstrong and Opitz contract were dated April 15, 1972, and the amendments to the Grandlich-Heather Hills contract were dated April 26, 1972. *51 All of the amendments to both contracts were substantially identical. The amendments, which clarified certain contract provisions and modified others, provided as follows: (1) the purchasers were to begin payment at "Time T" rather than on September 1, 1972. In the amendments, "Time T" was defined as the time at which the Chapel Hill apartments achieved a gross monthly income of $24,000. Petitioner Armstrong testified that $24,000 in monthly rental income represented approximately 75 percent of the apartments' potential monthly rental income; (2) the amount of interest purchasers owed to the vendor for 1972 was fixed at $90,000, which was the estimated amount of interest due on the unpaid balance of $2,220,000 at the rate of 9.725 percent per year from April 1, 1972, until September 1, 1972; (3) the amount of 1972 real estate taxes for which purchasers were liable was limited to $35,000, which was the estimated amount of real estate taxes on the property for the period April 1, 1972, through December 31, 1972; (4) Grandlich agreed to manage the apartments until "Time T" in consideration of an amount equal to the rents accrued through "Time T." As manager, Grandlich also agreed to *52 pay all the costs of maintenance and operation of the apartments through "Time T." (5) The $500 per day liquidated damages clause was deleted. The parties decided that in lieu of the liquidated damages clause, the vendor would continue to bear the burden of the operating expenses without benefit of further payment of interest or real estate taxes by the purchasers if the vendor did not complete construction of the apartments and reach the "Time T" rental level by September 1, 1972. Although the purchasers were not to begin payment until "Time T" was reached, Armstrong and Opitz considered their obligation to purchase the apartments from Grandlich binding as of April 1, 1972. In addition, petitioners and respondent are in agreement that under the terms of the April 1, 1972, land contracts, as amended, Opitz and Armstrong as purchasers, had the following rights and obligations as of April 1, 1972: (1) the right to possession of the apartment complex; (2) the unconditional obligation to keep the apartment complex in good condition and repair; and (3) the unconditional obligation to maintain fire insurance on the apartment complex. Although Armstrong and Opitz had the obligation to *53 provide fire insurance on the apartment complex, on April 1, 1972, when the contracts were executed, Grandlich agreed to have the purchasers named as additional insureds on his existing policy covering the apartment complex, with no additional charge to the purchasers. Pursuant to this agreement, Grandlich paid the 1972 insurance premiums on the policy covering the apartment complex. In May 1972, Armstrong and Opitz formed the Wisconsin limited partnership known as Chapel Hill to own and operate the Chapel Hill apartment complex. Armstrong and Opitz were the general partners and the other petitioners in this case were the limited partners. The certificate of limited partnership was filed on June 1, 1972. On this same date, Armstrong and Opitz assigned in writing their purchasers' interest including all rights and obligations in the Heather Hills-Armstrong and Opitz land contract to the Chapel Hill partnership. On June 12, 1972, Armstrong executed an affidavit which stated: Perry J. Armstrong II, being first duly sworn, on oath deposes and says that: 1. The interest held by he and Kenneth D. Opitz as co-trustees * * * [in the Chapel Hill apartments] has been extinguished, *54 2. There now exists an interest in the [Chapel Hill apartments] in favor of CHAPEL HILL, a Limited Partnership. Petitioner Armstrong testified that this afidavit was intended to document the release to the partnership of the option to buy the apartments which he and Opitz held. The Chapel Hill apartment complex was first authorized for occupancy by the City of Madison on June 1, 1972, and was first occupied by tenants on that date. All leases were drawn in the name of the partnership and were signed and approved by either Armstrong or Opitz. All rents received were deposited in the partnership's bank account. At the end of each month, the amount of rents received would be computed and then such amount would be paid to Grandlich as a management fee pursuant to the terms of the management agreement contained in the amended April contracts. Although Grandlich, as manager, was responsible for the maintenance and operation of the apartments, Armstrong and Opitz retained the following functions in connection with the management of the apartments in addition to signing and approving leases: (1) review of the hiring and firing of maintenance personnel, (2) approval of any change *55 in the rent structure, and (3) approval of purchases of maintenance items and supplies. Later in 1972, after it became apparent that "Time T" would not be reached on September 1, 1972, the partnership advanced Grandlich most of the cash it was obligated to pay him at "Time T." These advancements were in the form of unsecured loans and were made as follows: $88,000 on September 27, 1972; $162,000 on October 11, 1972; and $70,000 on November 7, 1972. These unsecured loans to Grandlich were made only because Armstrong and Opitz considered the obligation to purchase the apartments binding on the partnership even though "Time T" had not yet been reached. On October 11, 1972, the Grandlich-Heather Hills land contract was amended to permit payment of the $90,000 interest on or before December 31, 1972, even if "Time T" had not yet arrived. On December 20, 1972, the partnership paid $90,000 in interest to Heather Hills and on this same date Heather Hills paid $90,000 in interest to the First Wisconsin National Bank of Madison for the account of Grandlich. The 1972 real property tax bill on the Chapel Hill apartments was sent to the Chapel Hill partnership in care of Armstrong. On *56 December 26, 1972, the partnership paid $35,000 to the City of Madison, of which $34,797.50 was for real estate taxes and $202.50 was for a special assessment. On February 28, 1973, Grandlich, Heather Hills, and Armstrong and Opitz, on behalf of the partnership, stipulated that "Time T" occurred on that date. On the following day, March 1, 1973, Grandlich repaid the cash advances made to him by the partnership and pursuant to the terms of the amended April contracts, the partnership paid Heather Hills $225,000 and Heather Hills in turn paid Grandlich $225,000.Also on March 1, 1973, the partnership gave Heather Hills a $150,000 mortgage note and Heather Hills in turn gave Grandlich a $150,000 mortgage note. Furthermore, Grandlich and Heather Hills stipulated that the remaining purchase payments could be made directly to the holders of Grandlich's underlying mortgage. However, since Grandlich remained personally liable on the underlying mortgage, the partnership was not given a deed to the property on March 1, 1973, because Grandlich preferred to retain the remedy of land contract foreclosure against the partnership. The management agreement between the partnership and Grandlich *57 terminated as of March 1, 1973, and on this same date a new contract to manage the Chapel Hill apartments was entered into by the partnership and Opitz Realty, Inc. On March 2, 1973, Armstrong and Opitz purchased an insurance policy covering the Chapel Hill apartments. In March of 1973 National Mortgage received its $40,000 sales commision from Grandlich. Later in 1973, pursuant to the 1971 agreement between National Mortgage and Armstrong and Opitz, National Mortgage paid Armstrong and Opitz $9,000 each. Grandlich reported the sale of the Chapel Hill apartments on his 1971 Federal income tax return at a price of $2,225,000. On his 1972 Federal income tax return, Grandlich claimed no deduction for depreciation on the apartments, but he did claim a $39,645.68 loss on the operation of the apartments under the management contract he had with the partnership. On its 1972 Federal income tax return, the Chapel Hill partnership reported all of the rental income derived from the Chapel Hill apartments in 1972. The partnership also claimed deductions for: (1) management fees; (2) accelerated depreciation under the double declining balance method on the apartments for the period June 1, 1972, through *58 December 31, 1972; (3) $90,000 in interest; and (4) $34,797.50 in real estate taxes. As a result of the deductions claimed by the partnership, it reported a loss for 1972. The petitioners reported their individual shares of this loss on their 1972 Federal income tax returns. On its 1973 Federal income tax return, the partnership reported all of the apartments' 1973 rental income and claimed deductions for: (1) accelerated depreciation under the double declining balance method on the apartments for the entire year; (2) management fees; and (3) numerous other expenses incurred in connection with the operation of the apartments. As in 1972, the partnership reported a loss for 1973 and the petitioners claimed their individual shares of this loss on their 1973 Federal income tax returns. On petitioner Armstrong's 1973 individual Federal tax return, he reported his receipt of the $9,000 from National Mortgage as capital gain from the release to the partnership of his option to buy the Chapel Hill apartments. However, Opitz considered the $9,000 to be income to his real estate brokerage firm and, consequently, this payment was reported by his firm on its 1973 return. Respondent *59 in his statutory notice for 1972 determined that the partnership was not the owner of the Chapel Hill apartments until March 1, 1973, and therefore disallowed the depreciation deduction taken by the partnership in 1972. Respondent also determined that the $90,000 interest deduction and the $34,797.50 real estate tax deduction claimed by the partnership for 1972 were nondeductible capital expenditures. Respondent accordingly reduced the partnership's 1972 loss and each petitioner's share of that loss. Since respondent determined that the partnership did not become owner of the apartments until March 1, 1973, in his statutory notices for 1973, the respondent disallowed the partnership's depreciation deduction for January and February of 1973. Respondent also determined that for the period March 1, 1973, through December 31, 1973, the partnership was not entitled to accelerated depreciation under section 167(b) because the partnership was not the "original user" of the apartments within the meaning of section 167(j)(2). Respondent accordingly reduced the partnership's 1973 loss and each petitioner's share of that loss. In the statutory notice sent to petitioner Armstrong for *60 1973, respondent determined that the $9,000 Armstrong received from National Mortgage was a commission payment and therefore ordinary income rather than capital gain. OPINION The first issue for decision is when did the Chapel Hill partnership acquire an economic interest in the Chapel Hill apartment complex so as to be entitled to a deduction for depreciation under section 167(a). As a general rule, section 167(a) provides that there shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear of property used in the trade or business or held for the production of income by a taxpayer. However, a taxpayer is not entitled to a deduction for depreciation until he acquires an economic interest in property that will decrease in value as a result of depreciation. Helvering v. Lazarus & Co.,308 U.S. 252, 254 (1939); Miller v. Commissioner,68 T.C. 767, 775 (1977). Moreover, when a taxpayer enters a contract to purchase property, the taxpayer does not acquire a depreciable interest in the property until the sale is complete. Baird v. Commissioner,68 T.C. 115, 124-125 (1977). The question *61 of when a sale is complete is essentially a question of fact. No hard and fast rules of thumb exist and no single factor is controlling. The test to be applied is a practical one, taking into account all the facts and circumstances surrounding the transaction and the intent of the parties. Clodfelter v. Commissioner,426 F.2d 1391, 1393-1394 (9th Cir. 1970), affg. 48 T.C. 694 (1967); Baird v. Commissioner,supra;Deyoe v. Commissioner,66 T.C. 904, 910 (1976). Generally, a sale of real property will be complete on the transfer of legal title to the purchaser or upon the shift of the burdens and benefits of ownership to the purchaser if such shift occurs before the transfer of title. Baird v. Commissioner,supra;Deyoe v. Commissioner,supra. Thus, where passage of title is delayed to secure payment of the purchase price, the sale will be complete upon the acquisition of the burdens and benefits of ownership by the purchaser. Deyoe v. Commissioner,supra;Merrill v. Commissioner,40 T.C. 66, 76 (1963), affd. per curiam 336 F.2d 771 (9th Cir. 1964). *62 In the present case, since Grandlich, as seller, was entitled to retain the deed and thus legal title to the Chapel Hill apartments until the partnership paid off the mortgage, to determine at what point the partnership acquired a depreciable interest in the apartments, we must first determine when the partnership acquired the burdens and benefits of ownership of the apartments. Petitioners argue that the Chapel Hill partnership acquired the burdens and benefits of ownership of the Chapel Hill apartments on June 1, 1972, when Armstrong and Optiz assigned their vendees' interest in the April 1, 1972, land contract to the partnership. In support of this argument, petitioners contend that the partnership had the following rights and obligations under the April contract: The unconditional obligation to purchase the apartments at a fixed price; the burden of wear and tear; the right to possession; the burden of insuring against losses; and the burden of interest and real estate taxes. Respondent, on the other hand, takes the position that until "Time T", February 28, 1973, Grandlich, the seller, had the right to all the rental income from the apartments and was responsible for the *63 mortgage payments and numerous other expenses incurred in connection with his maintenance and operation of the apartments. Respondent, therefore, contends that the partnership did not acquire the burdens and benefits of ownership of the apartments until March 1, 1973. Taking into consideration all the facts and circumstances in this case, we conclude that the sale of the apartments to Armstrong and Opitz was complete on April 1, 1972, and the partnership acquired the burdens and benefits of ownership on June 1, 1972, when Armstrong and Opitz assigned their vendees' interest in the April 1, 1972, contract to the partnership. Our decision rests on a number of factors. First, we believe that the partnership as assignee under the amended April contract had the unconditional obligation to pay a fixed price for the apartments as of June 1, 1972. Respondent takes the position that the amended April contract was conditional because the partnership did not have to begin making purchase payments to the seller, Grandlich, until "Time T" was reached and, therefore, the partnership had no obligation to purchase the apartments until "Time T" was reached. [4] However, under Wisconsin law, *64 the fact that the time of payment under a contract to purchase land is controlled by the occurrence of a future event does not necessarily make the contract conditional. Locke v. Bort,10 Wis 2d 585, 103 N.W.2d 555, 559 (1960). see also Boulevard Builders, Inc. v. Snyder,13 Wis. 2d 486, 108 N.W.2d 914, 916 (1961). The controlling factor in determining whether a contract is conditional is the intent of the parties. Sprecher v. Weston's Bar, Inc.,78 Wis. 2d 26, 253 N.W.2d 493, 497 (1977); Locke v. Bort,supra, at 558. The evidence in the record makes it clear that the parties to the *65 April 1, 1972, contracts considered the vendees' obligation to purchase the apartments binding as of April 1, 1972. Nowhere in the language of the amended April contracts is the vendees' obligation to purchase the apartments described as conditional. In addition, both Armstrong and Opitz testified that they considered their obligation to purchase binding as of April 1, 1972, and the occurrence of "Time T" as merely controlling the time of payment. Armstrong further testified that the unsecured loans made by the partnership to Grandlich in the fall of 1972, prior to the occurrence of "Time T," would never have been made if the partnership's obligation to purchase the apartments was conditional. Since the partnership had the unconditional obligation to pay Grandlich $2,225,000 for the appartments as of June 1, 1972, if the value of the apartments fell below $2,225,000 after June 1, 1972, the partnership bore the risk of this form of economic depreciation and such a risk is clearly one of the burdens of ownership. Merrill v. Commissioner, 40 T.C. 66, 76 (1963), affd. 336 F.2d 771 (9th Cir. 1964); Wisconsin Electric Power Co. v. Commissioner, 18 T.C. 400, 402 (1952). *66 Second, petitioner and respondent agree that under the terms of the amended April contracts, the purchasers had the unconditional obligation to keep the apartments in good condition and repair. This obligation was contrary to a clause in the December 30, 1971, contract which provided that the purchasers had the obligation to keep the apartments in good condition and repair except for ordinary were and decay. This exception for ordinary wear and decay was deleted in the April contrscts. We believe this deletion indicates that the parties intended the purchasers, Armstrong and Opitz, to have the burden of wear and tear as of April 1, 1972, and when the April contract was assigned to the partnership on June 1, 1972, it assumed this burden of wear and tear. This burden is certainly a burden of ownership. Royal St. Louis, Inc. v. United States, 578 F.2d 1017, 1020 (5th Cir. 1978). Third, petitioner and respondent agree that under the terms of the amended April contracts, Armstrong and Opitz, as purchasers, were entitled to possession of the apartments on April 1, 1972. When Armstrong and Opitz assigned the April contract to the partnership on June 1, 1972, it *67 acquired this right to possession. Although actual possession is not an essential element of a depreciable interest in property, it is one of the benefits of ownership. Commissioner v. Segall, 114 F.2d 706, 709 (6th Cir. 1940); Fort Hamilton Manor, Inc. v. Commissioner, 51 T.C. 707, 720 (1969), affd. 445 F.2d 879 (2d Cir. 1971).
Fourth, petitioner and respondent also agree that under the terms of the amended April contracts, the purchasers had the unconditional obligation to maintain fire insurance on the apartments. However, when the April contracts were executed, Grandlich agreed to have the purchasers named as additional insureds on his existing policy convering the apartments with no additional charge to the purchasers. Pursuant to this agreement, Grandlich paid the 1972 insurance premiums on the policy convering the apartments. Thus, even though the partnership assumed the contractual obligation to provide fire insurance on the apartments when it was assigned the contract on June 1, 1972, since Grandlich paid the insurance premium for 1972, the partnership did not actually have the burden of insuring the property. Nevertheless, *68 under the Wisconsin Uniform Vendor and Purchaser Risk Act, Wis. Stats. sec. 706.12, the partnership, as a purchaser in possession, had the risk of any uninsured loss. Section 706.12(1)(b) of the Uniform Act provides as follows: If, when either the legal title or the possession of the subject matter of the contract has been transferred, all or any part thereof is destroyed without fault of the vendor or is taken by eminent domain, the purchaser is not thereby relieved from a duty to pay the price, nor is he entitled to recover any portion thereof that he has paid. This risk of loss which the partnership bore is another burden of ownership. 2 Lexington Avenue Corp. v. Commissioner, 26 T.C. 816, 824 (1956). Fifth, the partnership, as assigneee under the amended April contract, was liable for the real estate taxes on the apartment property from the date of the contract, April 1, 1972. On December 26, 1972, the partnership paid the City of Madison $34,797.50 in real estate taxes on the apartment property for 1972. The partnership was also obligated under the amended April contract to pay Grandlich $90,000 in interest, which was the estimated amount of *69 interest due on the unpaid balance of $2,220,000 at the rate of 9.725 percent per year for the period April 1, 1972, to September 1, 1972. On December 20, 1972, the partnership paid Grandlich, through Heather Hills, $90,000 in interest. Both of these expenses incurred by the partnership during 1972 are burdens of ownership. Deyoe v. Commissioner, 66 T.C. at 910, 911; Estate of Johnston v. Commissioner, 51 T.C. 290, 298 (1968), affd. sub nom. Dettmers v. Commissioner, 430 F.2d 1019 (6th Cir. 1970). Sixth, we are not persuaded by respondent's argument that since Grandlich, the seller, was entitled to all the rental income from the apartments and was responsible for the mortgage payments and numerous other apartment operation expenses until "Time T", February 28, 1973, the partnership did not acquire benefits and burdens of ownership of the apartments until March 1, 1973. In making this argument the respondent has overlooked the fact that Grandlich received the rent and paid the operating expenses under the terms of the management agreement set out in the amended April contracts. All of the rent received by the apartments between *70 June 1, 1972, and March 1, 1973, was reported by the partnership on its 1972 and 1973 returns. When the partnership would receive the rent it would in turn pay such rent to Grandlich as a management fee and then deduct these fees on its 1972 and 1973 returns. Consequently, Grandlich's receipt of the rents and his payment of the apartment operation expenses cannot properly be viewed as a benefit and burden of ownership held by Grandlich. Finally, the fact that Grandlich was liable on the mortgage does not by itself lead us to the conclusion that Grandlich retained the burdens and benefits of ownership until "Time T." Having concluded that the sale of the apartments was complete on April 1, 1972, and that the partnership acquired the burdens and benefits of ownership on June 1, 1972, when it was assigned the contract, we hold that the partnership had an economic interest in the apartments as of June 1, 1972, and was therefore entitled to deduct depreciation for the period June 1, 1972, through December 31, 1972, and for the entire year 1973. The second issue we must decide is whether the Chapel Hill partnership was the "original user" of the Chapel Hill apartment complex within *71 the meaning of section 167(j)(2) so as to qualify for accelerated depreciation under section 167(b) in 1972 and 1973. Under section 167(b) a taxpayer may deduct depreciation on property using one of several methods including the straight line method and such accelerated methods as the declining balance method and the sum of the years-digits method. Section 167(j)(2) provides that a taxpayer may deduct depreciation on residential rental property under an accelerated method if the "original use" of the property commenced with the taxpayer. On its 1972 return, the partnership, using the double declining balance method, claimed depreciation on the apartments for the period June 1, 1972, through December 31, 1972. On its 1973 return, the partnership again used the double declining balance method and claimed depreciation on the apartments for the entire year 1973. Respondent concedes on brief that if the partnership acquired the burdens and benefits of ownership of the apartments on June 1, 1972, then the partnership constituted the "original user" of the property and was therefore entitled to use an accelerated method of depreciation during 1972 and 1973. Since we have already *72 found that the partnership acquired the burdens and benefits of ownership of the apartments on June 1, 1972, we hold that the partnership was entitled to accelerated depreciation on the apartments for the period June 1, 1972, through December 31, 1972, and for the entire year 1973. The third issue to be decided is whether the payment of $90,000 by the Chapel Hill partnership to Grandlich in December 1972 was deductible by the partnership in 1972 as interest under section 163(a). Section 163(a) permits a deduction for all interest paid or accrued within the taxable year on indebtedness. As assignee under the amended April contract, the partnership was obligated in 1972 to pay Grandlich $90,000 in interest on the balance of the unpaid purchase price. On December 20, 1972, the partnership paid Grandlich, through Heather Hills, $90,000 in interest and deducted this amount on its 1972 return. Respondent concedes on brief that if the partnership acquired the benefits and burdens of ownership of the apartments on June 1, 1972, then the partnership was entitled to deduct the $90,000 in 1972 as interest. Since we have found that the partnership acquired the benefits and burdens *73 of ownership of the apartments on June 1, 1972, we therefore hold that the partnership properly deducted the $90,000 in 1972 interest. The fourth issue we must decide is whether the payment of $34,797.50 by the Chapel Hill partnership to the City of Madison in December 1972 was deductible by the partnership in 1972 as real estate taxes under section 164(a). Section 164(a) permits a deduction for state and local real property taxes paid or accrued within the taxable year. If real property is sold during the taxable year, section 164(d) provides that the portion of the real property tax allocable to the part of the year prior to sale shall be treated as a tax imposed on the seller, and the portion of the real property tax allocable to the part of the year after the sale shall be treated as a tax imposed on the purchaser. As assignee under the amended April contract, the partnership was liable for the real estate taxes on the apartment property from the date of the contract, April 1, 1972. On December 26, 1972, the partnership paid the City of Madison $34,797.50 in real estate taxes on the apartment property for 1972 and deducted this amount on its 1972 return. Respondent *74 concedes on brief that if the sale of the apartments occurred on April 1, 1972, then the partnership was entitled to deduct the $34,797.50 in real estate taxes in 1972. Since we have already found that the sale of the apartments was complete on April 1, 1972, and that the partnership was obligated to pay the real estate taxes, we hold that the partnership properly deducted the $34,797.50 in real estate taxes in 1972.
The fifth and final issue for decision is whether the $9,000 received by petitioner Armstrong in March 1973 was a commission payment and therefore ordinary income, or a payment for the release of an option and therefore entitled to capital gain treatment under section 1234(a). In 1971 when Grandlich was attempting to sell the Chapel Hill apartments, he gave National Mortgage an oral listing and agreed to pay National Mortgage a commission of $40,000 if an acceptable sale was arranged. In October of 1971, Armstrong secured an oral option from Grandlich to buy the apartments. No payment was made by Armstrong to Grandlich for this option.Armstrong did not personally have the funds to purchase the apartments, but intended to bring in other investors to obtain the necessary *75 capital. Since Armstrong owned an abstract title insurance company in Madison and was not a real estate broker, to help him find other investors, Armstrong contacted Opitz, who was a real estate broker in Madison. Opitz subsequently agreed to help Armstrong find investors with the capital to purchase the apartments. In exchange for Opitz' help, Armstrong orally assigned a one-half interest in his option to Opitz. At the same time Armstrong and Opitz were working with Grandlich to arrange a sale of the apartments, National Mortgage was attempting to arrange a sale with Roger Gaumnitz, an employee of Opitz' real estate brokerage firm. When National Mortgage learned that Armstrong and Opitz had an option to buy the apartments from Grandlich, an officer of National Mortgage contacted them and explained that before Grandlich could sell the apartments he needed the consent of the holders of the mortgage notes on the apartment property. The officer also told Armstrong and Opitz that National Mortgage was in a position to proevent the mortgage note holders from giving their consent unless National Mortgage's right to the $40,000 sales commission was preserved. To avoid problems in *76 obtaining the consent of the mortgage note holders, Armstrong and Opitz agreed with National Mortgage that the $40,000 commission should be split; National Mortgage would keep $22,000 and Armstrong and Opitz would each receive $9,000.On December 29, 1971, National Mortgage sent a letter to Armstrong confirming their agreement. The letter stated in part: Enclosed is a copy of the letter agreement regarding the commissions for the sale of Chapel Hill between [Grandlich] and National Mortgage Corporation. This is to confirm that when National Mortgage Corporation receives the $40,000.00 at "Time T", National Mortgage Corporation will pay you $18,000.00 for the release of your options. Thereafter, on June 12, 1972, Armstrong executed an affidavit in which he stated that the "interest" in the Chapel Hill apartments held by him and Opitz had been extinguished and this "interest" now existed in favor of the Chapel Hill partnership. Armstrong testified this document was intended to document the release to the partnership of the option to buy the apartments which he and Opitz held. In March 1973, National Mortgage received its $40,000 commission of the sale of the apartments from *77 Grandlich. Later in 1973, pursuant to the 1971 agreement between National Mortgage and Armstrong and Opitz, National Mortgage paid Armstrong and Opitz $9,000 each. Armstrong and Opitz' reporting of this payment was inconsistent. Opitz considered the $9,000 to be income to his real estate brokerage firm and, consequently, this payment was reported by his firm on its 1973 return. Armstrong, however, treated the $9,000 as capital gain on his 1973 return. The respondent disallowed Armstrong's treatment and determined instead that the $9,000 was ordinary income to him in 1973.
Petitioner Armstrong contends that the $9,000 payment was for the release to the partnership of his option to buy the apartments and therefore entitled to capital gain treatment as the sale of an option under section 1234(a). [5] Respondent, on the other hand, argues that this $9,000 payment Armstrong received was not for the release of his option but was, in reality, a commission payment as part of a co-brokerage fee on the sale of the apartments to the partnership. In support of this argument, respondent contends that when Armstrong and Opitz and National Mortgage discovered that they had been working independently *78 of each other to arrange a sale of the apartments, an agreement was reached whereby National Mortgage would split the $40,000 commission with Armstrong and Opitz. Although petitioner Armstrong argues that the $9,000 was for the release of his option, the evidence he presented indicates nothing more than in form the transaction was a payment for the release of his option. However, the substance not the form of a transaction controls for tax purposes. Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945); Gregory v. Helvering, 293 U.S. 465, 470 (1935). Moreover, the burden of proving that the transaction was in substance a payment for the release of an option is on petitioner *79 Armstrong. Rule 142, Tax Court Rules of Practice and Procedure.
Based on the evidence presented, we conclude that petitioner Armstrong has failed to prove that the $9,000 he received in 1972 was in substance a payment for the release of his option to buy the apartments. We therefore sustain respondent's determination that the $9,000 Armstrong received in 1973 was ordinary income. To reflect concessions and the foregoing, Decisions will be entered under Rule 155. Footnotes
1. The following cases have been consolidated for purposes of trial, briefing, and opinion: Gary W. Woroch and Lorraine I. Woroch, docket No. 3107-77; Marcia L. Terman, docket No. 3108-77; Lealands Corporation, docket No. 3109-77; Duane A. Anderson and Phyllis Anderson, docket No. 3110-77; Raymond J. Morton and Letty Morton, docket No. 3111-77; Kenneth D. Opitz and Carol J. Opitz, docket No. 3112-77; Robert A. Sandahl and Elaine R. Sandahl, docket No. 3113-77; Michael E. Donogan and Maryln A. Donogan, docket No. 3114-77; John A. Frantz and Mary H. Frantz, docket No. 3115-77; Perry J. Armstrong and Sheila J. Armstrong, docket No. 3116-77; Douglas J. Baker and Winifred N. Baker, docket No. 3117-77; Tad M. Baker and Diane L. Baker, docket No. 3118-77; William E. Currier, docket No. 3119-77; William E. Currier and Carol J. Currier, docket No. 6856-77; Marcus Cohen and Sheila Cohen, docket No. 3120-77.↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended, and in force during the years in issue.↩
3. Arthur G. Grandlich, the seller, was not called as a witness at trial by either petitioner or respondent.↩
4. Respondent made a preliminary argument on brief that the December 30, 1971, contract was the final agreement of the parties and under that contract the benefits and burdens of ownership were ot to shift until "Time T". However, it is clear that the December 30, 1971, contract was amended by the April 1, 1972, contracts and, therefore, under Wisconsin law the rights and obligations of the vendor and purchasers were controlled by the April contracts. See Estreen v. Bluhm,79 Wis. 2d 142, 255 N.W.2d 473, 479↩ (1977).
5. SEC. 1234. OPTIONS TO BUY OR SELL. (a) Treatment of Gain or Loss.--Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, a privilege or option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option or privilege relates has in the hands of the taxpayer (or would have in the hands of the taxpayer if acquired by him).↩